Duane NICE, Plaintiff and Respondent,

v.

LASSEY IMPLEMENT, INC., Defendant.

Everett DAVIS, Jr., Administrator of the Estate of Ronald Davis, Decedent, Defendant and Third Party Plaintiff and Respondent,

v.

HOME INDEMNITY COMPANY OF NEW YORK, Third Party Defendant and Appellant.

No. 7966.

Supreme Court of North Dakota.

March 22, 1962.

McGee, Van Sickle & Hankla, Minot, for third party defendant and appellant.

Ray H. Walton, Williston, and Edward E. Dessert and Romaine R. Powell, Bemidji, Minn., for plaintiff and respondent.

Dale H. Jensen, Asst. Atty. Gen., for defendant and third party plaintiff and respondent.

TEIGEN, Judge.

This is an action under third party practice by the plaintiff, Duane Nice, judgment creditor, and the defendant and third party plaintiff, Everett Davis, Jr., Administrator of the Estate of Ronald Davis, decedent, judgment debtor, against the third party defendant, Home Indemnity Company of New York. The action is bottomed on the omnibus clause of a garage liability policy issued by the third party defendant, Home Indemnity Company of New York, to Roth Motor Company of Williston, North Dakota, as the named insured.

The appeal is by the third party defendant, Home Indemnity Company of New York, from an adverse judgment.

In the main action the plaintiff, Duane Nice, had obtained judgment against the defendant, Everett Davis, Jr., Administrator of the Estate of Ronald Davis, decedent, for personal injuries sustained by the plaintiff while riding with the decedent, Ronald Davis, when an accident occurred in which the said Ronald Davis was killed. Before trial of the main action, the defendant, as third party plaintiff, impleaded Home Indemnity Company of New York as third party defendant on the theory that Ronald Davis, at the time of the occurrence of the event, was an insured under the omnibus clause of the garage liability policy written for Roth Motor Company of Williston. The actions were severed for the purposes of trial and, after entry of judgment for the plaintiff in the main action, Duane Nice, as plaintiff and judgment creditor, asserted his claim against the third party defendant on the theory that judgment had been entered in the main action against the defendant, an insured under the omnibus clause of said policy, thus entitling him to recover under the terms of the policy to the extent of the insurance afforded by the policy.

In addition, as a second cause of action, the plaintiff, Duane Nice, asserts claim against the third party defendant for the amount of the judgment obtained over and above the policy limits. He bases this assertion upon an assignment of the defendant-third party plaintiff's cause of action against the third party defendant for indemnity. This cause of action is premised

on a claim of negligence and bad faith on the part of the third party defendant in failing and refusing to defend or to take other steps for the protection and indemnity of the defendant and third party plaintiff. The defendant and third party plaintiff did not assign to the plaintiff its contractual claim against the third party defendant and thus its third party complaint for attorney's fees and costs in the main action remains unassigned.

The plaintiff obtained judgment in the main action against the defendant, the third party plaintiff, in the amount of $90,-455.22. The third party defendant, Home Indemnity Company of New York, at the time of the accident which occurred June 16, 1957, had in effect its policy of insurance whereby it insured Roth Motor Company and others against legal liability imposed upon Roth Motor Company or others insured under the terms of the policy as a result of accident. The policy limits were $50,000 for each person and $100,000 for each accident. The Home Indemnity Company denies that the driver of the automobile, Ronald Davis, deceased, or Everett Davis, Jr., Administrator of the Estate of Ronald Davis, decedent, are insureds under the terms of the policy but admits the policy was in effect at the time of the occurrence of the accident.

The policy of insurance is in evidence. Under the terms of the policy, it provides the following insuring agreements:

"DEFINITION OF HAZARDS. DIVISION 1—PREMISES—OPERATIONS—AUTOMOBILES: The ownership, maintenance or use of the premises for the purpose of an automobile sales agency, repair shop, service station, storage garage or public parking place, and all operations necessary or incidental thereto; and the ownership, maintenance or use of any automobile in connection with the above defined operations, and the occasional use for other business purposes and the use for non-business purposes of (1) any automobile owned by or in charge of the named insured and used principally in the above defined operations, and (2) any automobile owned by the named insured in connection with the above defined operations for the use of the named insured, a partner therein, an executive officer thereof, or a member of the household of any such person."

Another insuring agreement appears as follows:

"III. DEFINITION OF INSURED: With respect to the insurance under coverages A, B and D the unqualified word 'insured' includes the named insured and also includes (1) any partner, employee, director or stockholder thereof while acting within the scope of his duties as such, and any person or organization having a financial interest in the business of the named insured covered by this policy, and (2) any person while using an automobile covered by this policy, and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission. * * *."

On August 14, 1956, one Fred Amsterberg negotiated with Roth Motor Company of Williston, the named insured, for the purchase of a 1953 DeSoto Club Coupe. He traded in an older automobile as a part payment of the purchase price and signed a conditional sales contract for the balance of the purchase price, plus charges and interest to maturity. The conditional sales contract ran in favor of Roth Motor Company of Williston. The contract was in the amount of $999 and provided for monthly payments of $55.50 commencing on September 27, 1956, and payable monthly, with the last payment being due on February 27, 1958. Fred Amsterberg was given possession of the automobile. On August 16, 1956, the conditional sales contract was endorsed by Roth Motor Company and delivered to the American State

Bank of Williston. Fred Amsterberg, the conditional vendee, made payments on the contract to the American State Bank of Williston. On December 12, 1956, the motor vehicle department issued a certificate of title to the above-described automobile naming Fred Amsterberg as the registered owner and Roth Motor Company as the legal owner. A duplicate of this title was introduced in evidence. The evidence does not disclose by whom the certificate of title was possessed at the time of the accident.

Sometime shortly before April 15, 1957, Fred Amsterberg had the automobile repaired by Roth Motor Company. The cost of the repair was about $400. On April 15, 1957, a second conditional sales contract was negotiated by Fred Amsterberg for the purchase of the same automobile and the amount was increased from the balance due on the original contract to include most or all of the cost of repair. The amount of this contract was $1,110.06, including charges and interest to maturity. Roth Motor Company of Williston appeared thereon as the seller. It provided a schedule of monthly payments of $72.84. The first payment was due May 27, 1957, with a similar amount payable on the 27th day of each month until paid in full. On April 23, 1957, this contract was endorsed by Roth Motor Company and delivered to the American State Bank of Williston. Both contracts had been filed in the office of the register of deeds. The endorsements on each of said contracts were with recourse, Roth Motor Company guaranteeing payment. Both of said conditional sales contracts are in the usual single instrument form. The contract contains a promissory note and sets forth conditions of the sale, reserving ownership and the right of possession in the seller, and contains the stipulations that are characteristic of contracts for conditional sales. It specifically provides "the assignee shall be entitled to all of the rights of the seller." The first conditional sales contract had not become delinquent and "Renewed Note" was stamped across its face. Both contracts remained in the possession of the American State Bank of Williston.

Collision insurance coverage was carried on the automobile by another insurance company, to wit, Farmers Insurance Group. The policy is not in evidence but the testimony of an investigator for the Farmers Insurance Group indicates the policy was written in the name of Fred Amsterberg, as the insured, and perhaps both Roth Motor Company and the American State Bank of Williston as the lienholders.

On or about the day of the first payment of the second conditional sales contract became due, which was May 27, 1957, Fred Amsterberg had a conversation with Mr. Clifford E. Roth, manager of Roth Motor Company. At the time of this conversation, Amsterberg advised Roth that he would not be able to meet the obligations of the contract and expressed a desire for permission to sell the automobile, soliciting the assistance of Mr. Roth in doing so. It appears that Mr. Roth may have encouraged him to handle the transaction in that manner to protect his credit rating. Mr. Roth agreed that if a prospective purchaser could meet the requirements to become the conditional sales purchaser, in place of Mr. Amsterberg, that such an arrangement would be agreeable. He, therefore, advised Mr. Amsterberg that financial arrangements would have to meet his approval.

Mr. Amsterberg was employed at the John Iverson Company at Williston. Ronald Davis was employed at Hart Motor Express at Williston and made regular freight deliveries to the John Iverson Company. Amsterberg and Davis were acquainted. Davis was interested in the automobile and Amsterberg told Davis it was for sale. Davis drove the automobile on a trial run and told Amsterberg that he would like to buy it. Amsterberg told him he had no authority to sell it, that he did not want anything out of it himself and that he, Davis, would have to make financial arrangements with Mr. Roth. Davis went to

see Roth and satisfactory financial arrangements were orally agreed upon. This conversation took place some time the forepart of June, 1957, the exact date being unknown. The transaction could not be negotiated because Davis did not have the required money to make the cash payment required by Roth. Roth required a cash payment equivalent to two monthly payments of the second conditional sales contract, plus collision insurance premium for a six-month period, for a total of about $185. Davis advised Roth that he was paid on the 15th of each month and would return on Saturday, the 15th day of June, 1957, with the money to complete the transaction. Roth believed that Davis had the automobile in his possession when he came to see him, although he was not certain. He did not see Davis drive the automobile.

Davis then went to see Amsterberg and informed him that he had made financial arrangements satisfactory to Roth and that Roth had told him he could take possession of the automobile. Amsterberg then gave possession of the automobile to Davis. Roth denies that he had given permission to Davis to take possession of the automobile. A few days later, and perhaps on or about the 13th of June, Roth and Amsterberg had a second meeting. Roth advised Amsterberg that he understood Davis had possession of the automobile and informed Amsterberg that Davis had not completed financial arrangements. An attempt was made to contact Davis by telephone but he was not in. Roth testified that he did not believe he had authority to repossess the car from Davis but that Amsterberg had. Davis did not complete the transaction on June 15th. It was a Saturday and Roth was out of town. Roth had communicated a message in some form, not explained by the record, to Davis that he would be absent from the city on the appointed day, and that Davis should come in on Monday, June 17th, to complete the transaction. The accident occurred on June 16th. It resulted in the death of Mr. Davis and serious injury to Duane Nice, the plaintiff herein, who was a passenger in the automobile being driven by Davis.

Subsequent thereto the Farmers Insurance Group, carrying collision insurance on the automobile, paid the loss. It appears the check may have been made payable to Mr. Amsterberg and Roth Motor Company jointly. The check was endorsed by them both and turned over to the American State Bank. The American State Bank stamped both conditional sales contracts paid on August 21, 1957.

The trial court held that at the time of the accident, to wit, June 16, 1957, Roth Motor Company was the owner of the 1953 DeSoto automobile operated by Ronald Davis at the time of the occurrence of the accident. It held that by reason of the default of Mr. Amsterberg in the payment of the installment due on the conditional sales contract, Roth Motor Company became entitled to the immediate possession of said automobile; that the series of events referred to, involving Amsterberg, Davis and Clifford Roth, were tantamount to a repossession of said automobile by Roth Motor Company by agreement; that repossession continued to the date of the accident and prevailed at the time thereof; that Davis was a prospective purchaser of said automobile from Roth Motor Company; that Davis had obtained possession of the automobile with the mutual consent of Amsterberg and Roth Motor Company and, therefore, possession of the automobile was with permission of Roth Motor Company.

The court concluded the automobile qualified as an automobile covered by the terms of the said policy under the Definition of Hazards, Division I, in that the ownership of the automobile was in Roth Motor Company; that the use of the said automobile was incidental to and in connection with the business of Roth Motor Company as an automobile sales agency; that Davis drove said automobile as a prospective purchaser with the permission of the named insured, Roth Motor Company, and therefore Ronald

Davis was an insured under paragraph III of the Insuring Agreements of the policy.

The conditional sales contracts were endorsed and deposited with the American State Bank of Williston. They are negotiable in form. They are made payable to the order of Roth Motor Company of Williston, North Dakota, and provide that the assignee shall be entitled to all of the rights of the seller. The endorsement of Roth Motor Company guarantees payment. It appears the second conditional sales contract was accepted as a renewal of the first conditional sales contract. There is no evidence that the American State Bank had made demand on Roth Motor Company for payment, nor is there any evidence that the American State Bank had received payment of the contract from Roth Motor Company or that the American State Bank had made any demand against Roth Motor Company on its guarantee. Roth testified that Roth Motor Company had exercised no rights as guarantor. Both contracts were in the possession of the American State Bank at the time Davis obtained possession of the automobile and at the time of the accident in question.

There is evidence that indicates the conditional sales contract was sold to the bank. It appears Roth Motor Company receives money from the bank for these conditional sales contracts. The evidence does not establish who had possession of the certificate of title to the automobile. A duplicate certificate of title, issued March 5, 1959, was obtained from the motor vehicle registrar and placed in evidence. It indicates that the original certificate of title, following the sale of the automobile to Fred Amsterberg, was issued on December 12, 1956. It appears it was issued on the basis of an assignment by one Ed Olson, former owner, to Roth Motor Company, a reassignment by Roth Motor Company to Fred Amsterberg and application therefor by Fred Amsterberg. These instruments were dated November 27, 1956. Fred Amsterberg testified that he did not recall having had possession of the certificate of title. Mr. Roth of Roth Motor Company was not examined on the question and no witness was called for examination representing the American State Bank. The application for duplicate certificate of title was also placed in evidence; however, this application was not made until February 17, 1959. Roth Motor Company, as legal owner, made the application about one and one-half years after the conditional sales contracts had been marked paid by the American State Bank. It has little or no probative value for the purpose of establishing ownership on June 16, 1957, the date of the accident.

The duplicate certificate of title shows Fred Amsterberg as the registered owner and Roth Motor Company as the legal owner of the vehicle in question. The testimony of the investigator for the Farmers Insurance Group, the collision carrier on the automobile, is unsatisfactory. He testified he was not certain who was named as lienholder on their insurance policy, that it may have been both Roth Motor Company and the American State Bank of Williston. There is no evidence as to who was in possession of the policy.

In defining an insured, the provisions of the policy, Section III(2), provide for coverage of "any person while using *an automobile covered by this policy,* and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission." (Italics ours.)

An "automobile covered by this policy" is described under the Definition of Hazards, Division I. It insured: (A) "ownership, maintenance or use of the premises for the purpose of an automobile sales agency, repair shop, service station, storage garage or public parking place, and all operations necessary or incidental thereto;" (B) "ownership, maintenance or use of any automobile in connection with the above defined operation," and (C) "occasional use for other business purposes and the use for

non-business purposes of (1) any automobile owned by or in charge of the named insured and used principally in the above defined operations, and (2) any automobile owned by the named insured in connection with the above defined operations for the use of the named insured, a partner therein, an executive officer thereof, or a member of the household of any such person."

Coverage (B), described above, is broad in scope and is the coverage claimed to be applicable in this case.

A careful examination of the evidence does not clearly establish the "ownership, maintenance or use" of the automobile in question by the named insured, or with its permission, at the time of the occurrence of the accident. It appears likely from the evidence that an assignment has been made by the named insured, Roth Motor Company, of the conditional sales contract to the American State Bank. This transaction occurred before the date of the accident and was effective on the date of the accident. It appears that the legal ownership of the automobile in question may have been in the assignee. Tickfer v. Investment Corporation, 63 N.D. 613, 249 N.W. 702. For reference see also 47 Am.Jur., Sales, Sec. 929, etc., and 78 C.J.S. Sales § 638, etc.

Therefore, the transaction between Roth Motor Company and the American State Bank must be incorporated in the evidence in more detail. The transaction may have affected a transfer of ownership to the American State Bank, subject to the right of the purchaser, Amsterberg, under the contract.

The evidence does not establish to our satisfaction that the automobile was maintained or used by Roth Motor Company in connection with its operations as an automobile sales agency. Amsterberg had possession and equitable title. It was he who delivered possession to Davis, although he testified he did so because Davis told him he had made financial arrangements with Roth and could take possession. Roth re-

peatedly denied telling Davis that he could take possession of the automobile. He admits Davis came to see him and that he, Roth, outlined to him what he would have to do to purchase the automobile. Davis, however, did not have the money to make the down payment. It seems extremely unlikely that an automobile dealer of fifteen years experience would permit possession under such circumstances where no reason is shown. Roth's position that he had not given Davis permission to take possession of the automobile appears to be strengthened in a statement which Amsterberg had made prior to the trial. At the trial, the following question and answer were read to him from a transcript:

"Q. Was it your understanding that Davis had taken care of the payments at the time that he had gotten the car from you?

"A. That's right, supposed to have paid Mr. Roth. Made the settlement or arrangements with him to take the whole thing over. Of course he lied about it when he come down and he told me had made all arrangements and I didn't see Mr. Roth until maybe a week afterwards and Roth told me no arrangements whatsoever, were made with him and so I got on the phone— Cliff first got on the phone and called up the outfit that he used to work for, Hart Motor, and I talked to the man there and he said 'I'll personally tell you that you should personally change the papers over at the bank.' So I went up to the bank to get a loan and they told me that I would be unable to get one because I was behind on payments."

He was then asked if he remembered his statement and he answered: "Absolutely correct."

The question and answer set forth does not impeach Amsterberg's earlier testimony that Davis told him Roth had given him permission to take possession of the automo-

bile but it tends to substantiate Roth's position that permission to take possession had not been given. Roth also testified that he did not believe he had the authority to repossess the automobile from Davis. Amsterberg's testimony also tends to substantiate the truth of this testimony.

■ We are asked to try the case de novo. We find the evidence confusing and unsatisfactory on a major issue of the case. We are unable to arrive at a conclusion from the evidence which would lead us with certainty to a just determination of the controversy.

The plaintiff and the defendant-third party plaintiff in their respective complaints allege that the automobile being operated by the decedent, Ronald Davis, at the time of the occurrence of the accident, was an automobile covered by the terms of the policy of insurance written by the Home Indemnity Company of New York, third party defendant. This allegation was denied by the third party defendant in its answers. It is a basic question for decision in the action. It is one of the major issues of the case. It is necessary that additional evience be adduced to intelligently determine this issue.

For these reasons, and under the authority provided by Section 28–27–32, NDCC, we order a new trial of this action as a course necessary to the accomplishment of justice.

Our statements of evidence in this opinion are set forth for the purpose of showing the state of the record before us and are not necessarily binding upon the parties in the retrial of the case.

SATHRE, C. J., and BURKE, MORRIS and STRUTZ, JJ., concur.